UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

DANIEL CARROLL,

    Plaintiff,

v.

HORIZON BANK,

    Defendant.

Case No. 3:19-CV-1089 JD

## OPINION AND ORDER

Plaintiff Daniel Carroll's time working as a vice president in Defendant Horizon Bank's credit department ended abruptly in May 2018 when he was fired for what the bank told him was poor performance but what he believes was retaliation for his efforts to ensure a female subordinate received equal pay. Mr. Carroll filed this lawsuit after his termination, alleging that Horizon both retaliated against him for his advocacy and discriminated against him because he was male. Horizon eventually moved for summary judgment on both of Mr. Carroll's claims. Mr. Carroll responded to Horizon's motion by conceding his discrimination claim but defending his retaliation claim. For the following reasons, the Court finds summary judgment in favor of Horizon appropriate on both claims.

**I.    Factual Background**

There are a few preliminary issues that need to be addressed before recounting the applicable facts in this case. A party must support the facts upon which it relies at summary judgment by "citing to *particular parts* of materials *in the record*" that establish those facts. Fed. R. Civ. P. 56(c)(1) (emphasis added); *Sommerfield v. City of Chi.*, 863 F.3d 645, 650 (7th Cir. 2017); *Packer v. Trs. Of Ind Univ. Sch. Of Med*, 800 F.3d 843, 850 (7th Cir. 2015). This means

that for each factual assertion in the statement of facts and the argument sections, the brief should cite to a particular place in a specific exhibit that has been made a part of the record and supports that assertion.

Mr. Carroll's briefing falls short of that standard in several instances. For example, some factual assertions in Mr. Carroll's brief cited an alleged transcript of a recording that Mr. Carroll made when he returned after his termination to speak with an individual in Horizon's human resources department. (DE 37 at 7–8.) The Court does not have that transcript because it was never filed as part of the record, so the Court cannot properly consider the transcript or Mr. Carroll's arguments about it at this summary judgment stage. In other instances, Mr. Carroll recounted facts while either providing no citation to any evidence in the record or by providing a citation to a portion of the record that did not actually support the fact he was stating. *See, e.g.*, (DE 37 at 11–12, 18, 19.) Those improper citations do not suffice, and, in resolving Horizon's motion, the Court will rely only on the facts from both parties that have been properly supported with citation to the record. Fed. R. Civ. P. 56(c).

As an additional note, a party is prohibited from submitting a subsequent affidavit that contradicts the party's prior deposition or other sworn testimony. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020). Mr. Carroll's post-deposition declaration contradicts his prior sworn deposition testimony in some areas. *Compare* (DE 38-1, Carroll Dep. 85:24–86:10) *with* (DE 38-9 ¶ 18.) The Court ignores any contradictory statements in Mr. Carroll's declaration in deciding this motion and relies on Mr. Carroll's sworn deposition testimony instead. With those understandings, the Court addresses the pertinent facts.

Mr. Carroll's employment with Horizon Bank began in 2001 when Tom Edwards recruited him to join the bank. (DE 38-1, Carroll Dep. 33:19.) Mr. Carroll left the bank in 2011

but returned in 2016 when Horizon bought the bank at which he had been working and kept him on as an employee. (*Id.* at 38:2–7.) Within six months of his return, Horizon promoted Mr. Carroll to the position of vice president and senior commercial credit officer within the credit department, a role Mr. Carroll would serve in for the remainder of his time with Horizon. (*Id.* at 40:12–16.)

After the promotion, Mr. Carroll reported directly to Mr. Edwards, who was serving as president and chief credit officer. Mr. Edwards remained Mr. Carroll's supervisor through late 2017, but Mr. Edwards started transitioning some of his responsibilities to Dennis Kuhn, his planned replacement, in October 2017 because Mr. Edwards would be retiring at the end of the year. (*Id.* at 39:20–40:22; DE 38-3, Edwards Dep. 6:20–22, 7:22–8:4, 8:12–9:8; DE 38-7, Kuhn Dep. 38:13–39:1.) Mr. Kuhn eventually took over for Mr. Edwards as Mr. Carroll's direct supervisor and oversaw Mr. Carroll until Mr. Carroll was fired in May 2018. (DE 38-1, Carroll Dep. 40:10–11; DE 38-7, Kuhn Dep. 38:12–39:1.)

Mr. Carroll's role as vice president and senior commercial credit officer included responsibility for supervising several individuals working within the credit department. Those individuals included Allyson Oesterle-Kleine, Mike Yovanoff, Don VanLandegent, Mick Baird, Ema Loucks, and Scott Ellison. (DE 38-1, Carroll Dep. 44:8–14, 46:14–17, 50:25–51:11, 81:15–20; DE 38-4, Kuhn Dep. 36:5–25, 54–56.) Mr. Edwards had also asked Mr. Carroll, as part of his new role, to propose a plan to restructure Horizon's credit department, which Mr. Carroll did in the spring of 2017. (DE 38-1, Carroll Dep. 16:13–23; DE 38-3, Edwards Dep. 18:20–25.) Mr. Carroll proposed creating three regional credit manager positions within the department under him who would each, in turn, oversee their own group of credit analysts. Under the proposal, Ms. Oesterle-Kleine and Mr. Yovanoff would be promoted to two of the regional credit manager

positions and Mr. VanLandegent would take the third. (DE 32-1, Pressinell Dec. ¶ 7; DE 38-1, Carroll Dep. 44:10–25, 108:3–15; DE 38-3, Edwards Dep. 30:19–25; DE 38-7, Kuhn Dep. 13:14–17.)

At the same time he was formulating and preparing to present his restructuring proposal, Mr. Carroll was also working to obtain a pay increase for Ms. Oesterle-Kleine and two male employees within the credit department. He submitted special salary increase paperwork to Horizon's human resources department in May 2017 citing the need to make the individuals' salaries more competitive in the industry. Mr. Carroll's salary increase requests were not connected to his proposal to restructure the credit department and he did not frame the salary increase request for Ms. Oesterle-Kleine as an equal pay concern. He instead framed it as a way to protect against another bank poaching her by offering a higher salary. (DE 32-2 at 150–51; DE 38-1, Carroll Dep. 158:6–160:13.) Mr. Carroll expected that Ms. Oesterle-Kleine's salary would be raised even further if she were promoted under his proposed restructuring of the credit department. (DE 38-1, Carroll Dep. 158:18–22.)

Mr. Carroll eventually presented his restructuring proposal at a June 2017 strategy meeting. (*Id.* at 108:16–24; DE 38-7, Kuhn Dep. 12:15–18.) During his presentation, Mr. Carroll mentioned that Ms. Oesterle-Kleine's salary would need to be raised if she were promoted under the proposal because her salary was much lower than Mr. Yovanoff's and Mr. VanLandegent's. (DE 38-1, Carroll Dep. 152:7–153:8.) Those at the meeting viewed the proposal favorably. (DE 38-3, Edwards Dep. 19:9–21.) But Mr. Carroll and Horizon leadership took different things from the meeting. Mr. Carroll came away believing that the proposal had been approved and could begin being implemented, which he proceeded to do. (DE 38-1, Carroll Dep. 77:4–22, 120:24–121:7.) But Mr. Edwards and others in Horizon thought that several more steps had to be taken,

4

including creating official position listings for the positions that the restructuring would create and preparing paperwork and processes to promote the individuals, before the department restructuring could be implemented. (DE 38-3, Edwards Dep. 20:7–21:10, 24:7–25, 39:12–18, 41:22–42:4.) Those intermediate steps did not happen quickly, and it took Horizon until February or March 2018 to consider the restructuring officially approved and ready to implement. (DE 38-6, Pressinell Dep. 66:9–67:1; DE 38-7, Kuhn Dep. 17:17–19:21.)

Following the June 2017 strategy meeting, Mr. Carroll got approval from a Horizon human resources employee to reach out to Ms. Oesterle-Kleine, who was on maternity leave at the time, to tell her that she was expected to be promoted under the restructuring proposal and that there would be a salary review done in conjunction with that promotion. (DE 38-1, Carroll Dep. 16:24–17:7, 68:11–69:5, 76:1–6; DE 38-2, Oesterle-Kleine Dep. 17:13–18:13.) When Ms. Oesterle-Kleine returned from maternity leave, Mr. Carroll gave her increased supervisory responsibilities in line with the promised promotion to regional credit manager that Mr. Carroll understood to have already been approved. (DE 38-1, Carroll Dep. 75:9–76:6.) While Ms. Oesterle-Kleine took on the additional duties, she did not receive a new title or increased salary to go along with those new responsibilities. (*Id.* at 77:7–78:1; DE 38-2, Oesterle-Kleine Dep. 19:21–20:20.)

Ms. Oesterle-Kleine's new responsibilities without a promotion or salary increase did not sit well with her. The lack of action within Horizon to promote her and raise her salary despite the increased responsibilities made her believe that the promotion had only been mentioned to get her to return from maternity leave. (DE 38-2, Oesterle-Kleine Dep. 20:15–20, 35:15–23.) Around the same time she was growing frustrated with the lack of promotion, Ms. Oesterle-Kleine also became aware of a comment Mr. Carroll had made on her October 2017 mid-year

5

review in which Mr. Carroll noted that Ms. Oesterle-Kleine's performance had dropped since she had returned from maternity leave and attributed it in part to Ms. Oesterle-Kleine needing time "to adjust her mindset" after the leave "and get back into the flow of things at work." (DE 38-1, Carroll Dep. 63:23–64:15; DE 39-1 at 15–17.) Ms. Oesterle-Kleine told the human resources department that she found the comment "insulting and unsubstantiated." (DE 39-1 at 17.) She decided to leave the credit department in January 2018 and move to a different position in the bank, citing Mr. Carroll's comment and her lack of a raise as reasons for her departure. (DE 38-2, Oesterle-Kleine Dep. 21:21–22:2, 38:3–39:18; DE 38-6, Pressinell Dep. 74:18–20.) Ms. Oesterle-Kleine also later turned down Horizon's offer to fill the credit manager position when Horizon officially recognized the new position in 2018. (DE 38-2, Oesterle-Klein Dep. 41:1–10; DE 38-6, Pressinell Dep. 66:14–67:7.)

      Human resources employees and others within Horizon became aware of other issues with Mr. Carroll's subordinates at the end of 2017 and into early 2018. Mr. Carroll's subordinates, including Ms. Loucks, Ms. Oesterle-Kleine, Mr. Yovanoff, and Mr. Baird, complained to human resources and others within Horizon about Mr. Carroll's perceived managerial shortcomings, including ineffective communication, poor workload management, and a lack of appreciation shown toward his team. (DE 32-4 at 54–56; DE 38-2, Oesterle-Kleine Dep. 24:2–26:10, 56:11–18; DE 38-6, Pressinell Dep. 78:16–80:20, 128:21–129:2.) Mr. Kuhn was notified of these issues but did not independently investigate them. (DE 38-7, Kuhn Dep. 55:14–56:14.) Cindy Pressinell, a Horizon human resources employee, joined Mr. Kuhn and Mr. Carroll in meeting about these complaints, including Mr. Carroll's lack of availability, lack of mentoring, and lack of responsiveness, in early 2018. During their meeting, Mr. Kuhn and Ms. Pressinell told Mr. Carroll he needed to improve by making himself more available and having

better communication with his subordinates. (DE 32-4 at 54–56; DE 38-1, Carroll Dep. 80:22–82:23, 135:5–135:25; DE 38-6, Pressinell Dep. 129:15–130:12, 144:22–25; DE 38-7, Kuhn Dep. 34:5–35:19, 49:12–25, 50:9–51:2.)

Mr. Carroll attempted to make changes after the meeting, like scheduling times to check in with his subordinates, but he found that his subordinates often did not take advantage of his efforts. (DE 37 at 23–24; DE 38-1, Carroll Dep. 136:7–12.) Horizon ultimately fired Mr. Carroll on May 30, 2018, without fully following its discretionary, progressive discipline policy. (DE 38-1, Carroll Dep. 90:2–91:17; DE 38-4, Dwight Dep. 19:17–24; DE 39-1 at 26–28; DE 39-1 at 26.) Horizon told Mr. Carroll he was being fired because he had not made sufficient improvements on the issues that had been discussed at the meeting several months earlier. (DE 38-1, Carroll Dep. 90:2–91:17.)

The decision to terminate Mr. Carroll started with Mr. Kuhn, who had not been happy with Mr. Carroll's performance in his role. (DE 32-1 ¶ 9; DE 38-4, Dwight Dep. 49:3–50:18, 54:13–55:3; DE 38-7, Kuhn Dep. 57:6–58:6, 63:14–66:15.) In addition to the concerns from Mr. Carroll's subordinates that were the subject of the early 2018 meeting, Mr. Kuhn was on a conference call in April 2018 during which he thought Mr. Carroll acted in an aggressive, unprofessional, and demeaning way with respect to other call participants. (DE 38-6, Pressinell Dep. 106:18–22; DE 38-7, Kuhn Dep. 53:19–54:18.) Mr. Kuhn initially informed the human resources department of his desire to have Mr. Carroll terminated and then told Horizon's CEO Mr. Dwight that he would be moving to have Mr. Carroll fired, a notification Mr. Dwight viewed as only a courtesy "heads-up" instead of an effort to get Mr. Dwight's approval. (DE 38-4, Dwight Dep. 54:13–55:3; DE 38-7, Kuhn Dep. 57:6–58:6, 64:2–66:15.)

At the time of Mr. Carroll's firing, Mr. Kuhn did not know that Mr. Carroll had requested a special increase in Ms. Oesterle-Kleine's salary or that Mr. Carroll had raised any concerns about Ms. Oesterle-Kleine's salary needing to be increased because Mr. Carroll thought Horizon was discriminating against her with low pay. (DE 38-1, Carroll Dep. 167:3–9, 197:6–198:12, 199:19–200:10; DE 38-7, Kuhn Dep. 22:20–25:6.) Additionally, no one ever told Mr. Carroll that his termination was linked to his advocacy on behalf of Ms. Oesterle-Kleine and Mr. Carroll admitted that he was not privy to any of the discussions Horizon personnel had leading up to his termination. (DE 38-1, Carroll Dep. 88:23–89:24, 93:18–94:4, 96:17–97:13.)

After Mr. Carroll had been fired, Ms. Pressinell authored three memos that documented the conversations and meetings she had either participated in or been made aware of that related to complaints and other issues with Mr. Carroll that arose while he was employed with Horizon. Metadata for each of the three memos indicates Ms. Pressinell created them on June 4, 2018, but the memos are backdated to February 28, 2018, March 7, 2018, and April 13, 2018, respectively. (DE 39-1 at 29–31.) Ms. Pressinell stated that while the memos were written after Mr. Carroll was already fired, she wrote them based on notes that she had taken contemporaneously with the events described in each of the memos. (DE 32-1 ¶ 6.)

Following his termination, Mr. Carroll filed a charge of discrimination with the Equal Employment Opportunity Commission on February 14, 2019, alleging sex discrimination and retaliation based on his May 2018 termination. (DE 32-2 at 147–48.) The EEOC dismissed his charge in August 2019, and he filed this lawsuit thereafter in November 2019. (DE 1; DE 32-2 at 152.)

**II.     Standard of Review**

Summary judgment is proper when the moving party shows that there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" exists with respect to any material fact, and summary judgment is therefore inappropriate, when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Yet, where a factual record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party, as well as draw all reasonable and justifiable inferences in that party's favor. *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008). The nonmoving party cannot simply rest on the allegations or denials contained in its pleadings though. Summary judgment is the "put up or shut up" moment in the lawsuit for the nonmoving party where it must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). It is not enough for the nonmoving party to simply show there is some metaphysical doubt as to the material facts or present a mere scintilla of evidence in support of its position. Instead, there must be evidence on which the jury could reasonably find in favor of the nonmoving party. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citing *Matsushita*, 475 U.S. at 586–87; *Anderson*, 477 U.S. at 252).

**III.     Discussion**

Horizon moved for summary judgment on both of Mr. Carroll's claims. Because Mr. Carroll has conceded his sex discrimination claim, the Court finds summary judgment in Horizon's favor appropriate on that claim without further analysis. (DE 37 at 16.) Therefore, this order only focuses on the viability at this summary judgment stage of Mr. Carroll's retaliation claim.

To succeed on a Title VII retaliation claim, a plaintiff must show: 1) he engaged in a statutorily protected activity; 2) a materially adverse action taken by his employer; and 3) a causal connection between the two. *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016). In evaluating a retaliation claim, the court should conduct a straightforward inquiry, asking whether the record contains sufficient evidence to permit a reasonable factfinder to conclude that a retaliatory motive caused the materially adverse action. *Abrego v. Wilkie*, 907 F.3d 1004, 1014 (7th Cir. 2018) (citing *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016); *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)).

The first two elements for retaliation are not in dispute here. Horizon has conceded, solely for purposes of its summary judgment motion, that the Court should construe the facts as suggesting that Mr. Carroll engaged in statutorily protected advocacy by advocating for Ms. Oesterle-Kleine to receive a salary equal to those of her male colleagues. (DE 31 at 22 n.12.) And both Horizon and Mr. Carroll agree that Horizon's firing of Mr. Carroll in May 2018 qualified as an adverse employment action. (DE 44 at 7.) That leaves only the causation element in dispute.

Causation in the Title VII retaliation context refers to but-for causation. *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . This requires proof that the unlawful

10

retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.") A plaintiff can point to both direct and circumstantial evidence to demonstrate causation and survive summary judgment on a retaliation claim. *Abrego*, 907 F.3d at 1015 (citing *Gracia v. SignmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016); *Lord*, 839 F.3d at 563). Relevant causation evidence may include suspicious timing, ambiguous statements of animus, evidence other employees were treated differently, or evidence the employer's proffered reason for the adverse action was pretextual. *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019).

A review of the record before the Court, and Mr. Carroll's arguments against summary judgment based on that record, shows that there is insufficient evidence to permit a reasonable factfinder to conclude that Mr. Carroll's advocacy on Ms. Oesterle-Kleine's behalf was the but-for cause of his termination. Mr. Carroll has acknowledged a lack of direct evidence, admitting during his deposition testimony that no one associated with Horizon ever told him that his termination was related to his equal pay advocacy. (DE 38-1, Carroll Dep. 93:18–94:4, 96:17–97:13.) And while Mr. Carroll argued that available circumstantial evidence undermines Horizon's summary judgment arguments and shows Horizon gave a pretextual reason for firing him, the evidence is simply not there.

A primary problem that Mr. Carroll cannot overcome is that the decisionmaker within Horizon responsible for Mr. Carroll's termination, Mr. Carroll's supervisor Mr. Kuhn, testified that he had no knowledge of Mr. Carroll's advocacy at the time he successfully worked to have Mr. Carroll terminated. (DE 38-7, Kuhn Dep. 22:20–25:6, 57:6–58:6, 64:2–66:15.) A decisionmaker within a company cannot retaliate against someone for protected activity if that

decisionmaker never knew there had been protected activity in the first place. *See Eaton v. J.H. Findorrf & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021).

Horizon's argument that Mr. Kuhn was the decisionmaker is well-supported in the record. Mr. Kuhn himself stated during his deposition that he was the individual within Horizon who first recommended Mr. Carroll be fired and explained that he was the one who pursued the termination with both Horizon's human resources department and Horizon's CEO Mr. Dwight. (DE 38-7, Kuhn Dep. 63:14–64:21.) Mr. Dwight confirmed that Mr. Kuhn was the decisionmaker, explaining that he viewed the termination as something Mr. Kuhn led and that when Mr. Kuhn told him about the decision to terminate, the notification was a "heads-up" given out of respect rather than Mr. Kuhn asking him for an official ratification or approval of the decision. (DE 38-4, Dwight Dep. 49:3–50:18, 54:13–55:3.) Finally, Ms. Pressinell confirmed in her own sworn declaration that Mr. Kuhn, as Mr. Carroll's supervisor at the time of the firing, "made the decision to terminate Carroll." (DE 32-1 ¶ 9.)

Mr. Carroll attempted to cast doubt on the fact that Mr. Kuhn was the decisionmaker within Horizon by arguing that Ms. Pressinell, not Mr. Kuhn, was actually the "driving force" behind his termination. (DE 37 at 19–20.) Mr. Carroll argued that Ms. Pressinell had him fired "to deflect blame onto Carroll and away from herself for failing to implement the restructuring of the Credit Department and formalize Oesterle-Kleine's promotion." (DE 37 at 19–20.)[1] Mr. Carroll's argument about Ms. Pressinell's role does not preclude a finding that Mr. Kuhn was the

---

[1] The Court notes that in making this argument, Mr. Carroll undermines his retaliation claim by arguing that Ms. Pressinell led the effort within Horizon to fire him because she wanted to protect herself, not as a way to get back at him for advocating on Ms. Oesterle-Kleine's behalf. Not only is he alleging a wholly separate reason for his termination, but the reason he is alleging is not retaliatory under Title VII. *See Hague v. Equistar Chem. Co.*, 2002 WL 1968390, at *5 (N.D. Ill. Aug. 26, 2002) (citing *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002)) (holding that the act of terminating an employee to save one's own position does not constitute retaliation or show retaliatory animus).

12

decisionmaker though. Mr. Carroll cited to no evidence in the record for support, meaning his argument is nothing more than his subjective view of what happened and not enough to establish a genuine dispute of fact. *See Williams v. Bd. of Educ. of City of Chicago*, 982 F.3d 495, 509 (7th Cir. 2020), *reh'g denied* (Jan. 7, 2021) (a plaintiff's subjective views without accompanying evidentiary support "cannot carry the day"). His argument is further undermined by his admission that he was not in a position to know how Horizon made the decision to fire him because he was not involved in the decision-making process and thus had no personal knowledge on which to rely. (DE 38-1, Carroll Dep. 88:23–89:24, 136:13–19.)

Mr. Carroll also tried to dispute that Mr. Kuhn had no knowledge of his prior advocacy, pointing to Mr. Kuhn's knowledge that Ms. Oesterle-Kleine was in line for a higher salary under Mr. Carroll's proposal to restructure the credit department. (DE 37 at 19–20.) That argument too falls short though. As an initial matter, Mr. Carroll's argument contradicts his multiple statements during his deposition that he had no reason to believe that Mr. Kuhn knew about his advocacy on Ms. Oesterle-Kleine's behalf. (DE 38-1, Carroll Dep. 167:3–9, 197:6–198:12, 199:19–200:10.)

Even looking past that though, Mr. Kuhn knowing about the restructuring plan does not show that he knew Mr. Carroll had been advocating to fix what Mr. Carroll viewed as a problem with discriminatory pay. The restructuring plan would have benefitted more employees than just Ms. Oesterle-Kleine (*Id.* at 44:10–25, 108:3–15), and Mr. Carroll has pointed to no evidence that he or anyone else ever suggested to Mr. Kuhn that the restructuring plan was aimed at fixing what Mr. Carroll viewed as Ms. Oesterle-Kleine's discriminatory pay. *See Eaton*, 1 F.4th at 513 (holding that a plaintiff must show "actual knowledge of the protected activity" and that it "is not sufficient that a decision-maker could have or even should have known about" the employee's

advocacy). Without evidence to contradict that Mr. Kuhn was the decisionmaker within Horizon with respect to his termination or evidence to show Mr. Kuhn knew about his statutorily protected advocacy, Mr. Carroll cannot establish a causal connection between his advocacy and his termination. *See Eaton*, 1 F.4th at 512–13.

Adding more evidence to the lack of a causal connection between the advocacy and the termination though is the lengthy gap in time between Mr. Carroll's advocacy and his termination. Mr. Carroll testified during his deposition that he last advocated for equal pay for Ms. Oesterle-Kleine in October or November 2017. (DE 38-1, Carroll Dep. 199:4–14, 200:1–3.) He tried to walk that answer back in his response brief by arguing, again without citation to support in the record, that "his advocacy extended beyond the fall of 2017." (DE 37 at 18.) But the Court must base its decision on evidence in the record instead of subjective, unsupported assertions. *See Williams*, 982 F.3d at 509.

Based on the record evidence, roughly six months elapsed between when Mr. Carroll last advocated for Ms. Oesterle-Kleine to receive equal pay and when Mr. Carroll was terminated in May 2018. Mr. Carroll never explained why Horizon would have waited that long to fire him for his advocacy and never pointed to any portion of the record that explains the delay, despite Horizon pointing to the lengthy gap in its initial brief as an indication that the advocacy was not the but-for cause. (DE 31 at 23.) While the lengthy gap in time is not dispositive on its own, it diminishes a reasonable factfinder's ability to conclude that the advocacy was the but-for cause of Mr. Carroll's termination. *See, e.g.*, *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959–60 (7th Cir. 2021) (finding two-month gap between protected activities and termination not enough to show retaliation on its own); *Seymour-Reed v. Forest Pres. Dist. of DuPage Cty.*,

14

752 F. App'x 331, 336 (7th Cir. 2018) (holding that a four-month gap was not enough to show causation).

A final blow to Mr. Carroll's chances to survive summary judgment is his inability to point to evidence that Horizon's legitimate, non-retaliatory reason for terminating him was pretextual. Horizon has maintained the same reason for firing Mr. Carroll from the time Mr. Carroll was told he was fired in May 2018 to the present. Mr. Kuhn, as Mr. Carroll's supervisor, did not believe that Mr. Carroll had sufficiently improved as a manager despite having previously been told that improvement was necessary. (DE 38-1, Carroll Dep. 90:2–91:17; DE 44 at 10.) Mr. Carroll made several arguments in an attempt to show that reason was pretextual, but none of them could succeed in convincing a reasonable factfinder that Mr. Carroll has a viable retaliation claim.

To show pretext, "an employee must present evidence that the employer is dissembling." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). It is not enough to show faulty reasoning or mistaken judgment, *Barnes v. Bd. of Trustees of Univ. of Illinois*, 946 F.3d 384, 389–90 (7th Cir. 2020), and it is not enough to show the reason was cruel, unethical, or irrational, *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416, 418–19 (7th Cir. 2006). Instead, the plaintiff must show that the reason is a lie that the employer did not honestly believe. *Barnes*, 946 F.3d at 289; *Castro*, 786 F.3d at 565. An employee can establish pretext by identifying weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered reason that could convince a reasonable person that the proffered reason is unworthy of credence. *Castro*, 786 F.3d at 565.

Mr. Carroll's ability to show pretext is severely hampered at the outset by his admission that the managerial problems cited as the reason for his termination were not made up. The

record contains ample evidence that Mr. Carroll's subordinates were voicing complaints about his managerial style at the end of 2017 and into 2018. And there is clear evidence that individuals working with and overseeing Mr. Carroll, including Mr. Kuhn, Ms. Pressinell, and Mr. Edwards, discussed those complaints with him while informing him that he needed to make changes moving forward. (DE 32-4 at 54–56; DE 38-2, Oesterle-Kleine Dep. 24:2–26:10, 56:11–18; DE 38-3, Edwards Dep. 33:1–34:1, 36:12–14; DE 38-6, Pressinell Dep. 78:16–80:20, 106:18–22, 128:21–129:2, 129:15–130:12, 144:22–25; DE 38-7, Kuhn Dep. 34:5–35:19, 49:12–25, 50:8–51:2, 53:19–55:13.) Mr. Carroll admitted that his subordinates filed complaints and admitted that he met with Mr. Kuhn and Ms. Pressinell in early 2018 for a discussion about the need for improvement. (DE 38-1, Carroll Dep. 80:22–81:25, 135:5–135:25.) He thus is not arguing that the cited problems were made up, just that Horizon lied when it said those problems, and not his advocacy for Ms. Oesterle-Kleine, were the reason it fired him. (DE 37 at 21–25.)

Mr. Carroll first argued that his good performance reviews before the end of 2017 suggest that Horizon was lying when it said his poor managerial performance led to the termination. (DE 37 at 21–22.) That argument does not support pretext though. It is true that Mr. Carroll received favorable reviews before the end of 2017 (DE 38-3, Edwards Dep. 37:15–25, 40:10–41:21; DE 38-4, Dwight Dep. 49:3–23, 51:8–16, 61:12–62:20), but Horizon made clear that it was not those reviews or the opinion of Mr. Carroll's former supervisor, Mr. Edwards, that led Horizon to fire Mr. Carroll. It was instead the opinion of his new supervisor, Mr. Kuhn, and Mr. Carroll's admitted struggles as a manager toward the end of 2017 and into 2018, that led to the termination. (DE 38-1, Carroll Dep. 80:22–81:25, 135:5–135:25; DE 44 at 10.) There is nothing suspect about Horizon premising its decision on issues that Mr. Carroll himself admitted were real. And there is no reason to discount those issues simply because Mr. Carroll had

previously received good performance reviews. *See Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014) (holding the question is not whether the plaintiff ever met the employer's legitimate expectations, but rather whether he did so at the time leading up to his termination); (DE 38-4, Dwight Dep. 51:13–24) (explaining it was not unusual for an employee to be fired for something not listed in a performance review).

Mr. Carroll next attacked Mr. Kuhn's credibility, arguing that Mr. Kuhn's own alleged failures as a manager made his stated reason for the termination less than believable. (DE 37 at 23–24.) Mr. Carroll specifically pointed to evidence in the record that Mr. Kuhn did not look at Mr. Carroll's old performance reviews, discuss the lodged complaints with Mr. Carroll's subordinates who had filed them, examine the complaining employees' performance reviews, or, in Mr. Carroll's view, properly investigate or follow up on the complaints or Mr. Carroll's alleged efforts to improve after the early 2018 meeting before choosing to fire him. (*Id.*)

While Mr. Carroll may believe that Mr. Kuhn should have done a better job investigating and handling the complaints, a feeling that a manager should have done more before deciding to terminate does not suggest pretext. There must be evidence of a lie. *See Barnes*, 946 F.3d at 389–90; *Forrester*, 453 F.3d at 418–19. The record evidence shows that Mr. Kuhn believed there were serious enough problems with Mr. Carroll's management that he took the time to meet with Mr. Carroll about those problems in early 2018 and put Mr. Carroll on notice that Mr. Carroll needed to make improvements. (DE 38-1, Carroll Dep. 80:22–81:25, 135:5–135:25; DE 38-7, Kuhn Dep. 34:5–35:19, 49:12–25, 50:9–51:2, 53:19–55:13.) Then, after what Mr. Kuhn viewed as Mr. Carroll's inappropriate conduct on the conference call in April 2018 and Mr. Carroll's general failure to improve as a manager, Mr. Kuhn moved to fire Mr. Carroll. (DE 38-7, Kuhn Dep. 57:6–58:6, 64:14–25.) A suggestion that Mr. Kuhn's managerial process was not thorough

17

enough, or that he should have done more, does not show that he was lying, even if his decision could be considered unreasonable or irrational. *See*, *Barnes*, 946 F.3d 389–90 (criticisms of employer's process without evidence that process was used to hide discrimination is not enough for pretext); *Zayas*, 740 F.3d at 1158–59 (it is irrelevant whether the conduct was egregious enough to justify termination, as long as the employer believed it was).

  Mr. Carroll's third pretext argument centered on Horizon's undisputed failure to follow its progressive discipline policy before deciding to fire him. This argument falls short because it does not suggest inappropriate conduct, much less a lie. Horizon's progressive discipline policy made clear that the policy's methods for discipline were not mandatory, that Horizon could "administer discipline in any manner it sees fit," and that it did "not modify the status of employment-at-will or in any way restrict Horizon's right to bypass the disciplinary procedures suggested." (DE 39-1 at 26.) Mr. Carroll also did not point to any evidence that Horizon's decision to terminate him without following the progressive discipline policy was inconsistent with the way it has treated others who have been terminated. Given the discretion the policy allowed Horizon about its use and the lack of evidence that Horizon acted inconsistently by not following the policy, the Court cannot find that a reasonable factfinder could conclude that Horizon's decision to use its discretion and not follow the policy in Mr. Carroll's situation suggested Horizon was lying about its reason for firing Mr. Carroll.

  That conclusion is made even stronger by the fact that undisputed evidence in the record not only shows that there was a clear concern within Horizon about Mr. Carroll's management problems before he was fired, but also that Mr. Carroll was made aware of those concerns and told he needed to fix them before he was fired. (DE 38-1, Carroll Dep. 80:22–81:25, 135:5–25); *see, e.g.*, *Anderson v. Stauffer Chem. Co.*, 965 F.2d 397, 403 (7th Cir. 1992) (pretext not shown

by failure to use progressive discipline where company not required to use it and manager had met with employee to discuss complaints and need to improve); *see also Hague v. Thompson Dist. Co.*, 436 F.3d 816, 828 (7th Cir. 2006).

In Mr. Carroll's final pretext argument, he argued that the backdated nature of Ms. Pressinell's three memos documenting the various meetings and conversations between Mr. Kuhn, Ms. Pressinell, and others about Mr. Carroll's shortcomings before he was eventually fired suggests pretext. (DE 37 at 25.) Horizon has not disputed that Ms. Pressinell's memos were created after Mr. Carroll was fired and backdated, but it maintains that the backdated nature of the memos does not provide evidence of pretext. (DE 39-1 at 29–31; DE 44 at 14–15.) The Court agrees that the backdated memos do not support pretext for two reasons.

First, the record includes a sworn declaration from Ms. Pressinell in which she explained that while the memos may have been written after Horizon fired Mr. Carroll, she authored them based on notes she had taken contemporaneously with each of the meetings and conversations the memos documented. (DE 32-1 ¶ 6.) Mr. Carroll provided nothing to dispute Ms. Pressinell's declaration other than his own subjective belief that the backdated nature of the memos appeared suspicious. (DE 37 at 25); *see Williams*, 982 F.3d at 509. Ms. Pressinell's unrebutted testimony suggests that the memos were not fabrications to cover Horizon's tracks but instead a formal documentation of the notes she had collected from conversations about the real problems Mr. Carroll had while he was employed with Horizon.

Second, the memos are not the only part of the record that support Mr. Carroll having had the problems that Horizon cited as the reason for his termination. Deposition testimony from several individuals, including Mr. Carroll, confirm the problems and follow-up efforts that the memos describe. (DE 38-1, Carroll Dep. 80:22–81:25, 135:5–135:25; DE 38-2, Oesterle-Kleine

Dep. 24:2–26:10, 56:11–18; DE 38-3, Edwards Dep. 33:1–34:1, 36:12–14; DE 38-6, Pressinell Dep. 78:16–80:20, 128:21–129:2, 129:15–130:12, 144:22–25; DE 38-7, Kuhn Dep. 34:5–35:19, 49:12–25, 50:9–51:2.) That type of corroboration from separate parts of the record prevents the memos, backdated though they were, from being suggestive of a fabricated reason to disguise a retaliatory motive. *See, e.g.*, *Anderson*, 965 F.2d at 402 (noting theory that writeups were manufactured later to attempt to justify firing was undermined by fact that the issues had been discussed and were not "made up"). A reasonable factfinder thus could not conclude that the memos or other evidence suggest that Horizon's stated reason for firing Mr. Carroll was pretextual or, for the reasons discussed, that the available evidence suggests Mr. Carroll's advocacy was the but-for cause of his termination. Summary judgment for Horizon on Mr. Carroll's retaliation claim is appropriate.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS Defendant Horizon Bank's motion for summary judgment on each count in Plaintiff Daniel Carroll's complaint. (DE 30.) The Clerk is DIRECTED to enter judgment in favor of Defendant Horizon Bank.

SO ORDERED.

ENTERED: February 22, 2022

/s/ JON E. DEGUILIO
Chief Judge
United States District Court